**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

FILED
U.S. DISTRICT COURT
DISTRICT OF KANSAS

APR 5  2 31 PM '90

RALPH L. ERLOACH,
BY C. Muskerdeputy
ATT  ERA, KS.

RURAL TELEPHONE SERVICE
COMPANY, INC.,

        Plaintiff,

vs.

FEIST PUBLICATIONS, INC.,

        Defendant.

Case No. 83-4086-R

## MEMORANDUM AND ORDER

This is an antitrust action brought by way of a counterclaim. Feist Publications, Inc.(FP) contends that Rural Telephone Service Company, Inc.'s (RTSC) refusal to license white page telephone listings to it is an antitrust violation under the "essential facility" theory and/or "intent to monopolize" theory of section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. A trial to the court has been concluded. The court is now prepared to issue findings of fact and conclusions of law.

## FINDINGS OF FACT

1. RTSC is a cooperative telephone company providing service to various communities in northwest Kansas. All of the telephone subscribers in the RTSC service area are member owners. RTSC is a nonprofit business with all revenues exceeding the cost of doing business returned to members under a refund plan called capital credits. RTSC is a certified public utility and, as such, is regulated by the Kansas Corporation Commission (KCC). The service area of RTSC consists of the area colored in yellow on the map

120

attached to this memorandum and order as Attachment No. 1. RTSC has approximately 4,700 telephone subscribers.

2. In the course of its business, RTSC compiles, publishes and distributes telephone directories covering the geographical area in which it provides telephone service. The KCC requires all telephone companies operating in Kansas to issue at least annually a dated telephone directory. The telephone directories published by RTSC contain white pages and yellow pages. The white pages list in alphabetical order the names, addresses and telephone numbers of RTSC's telephone subscribers. The yellow pages list RTSC's business subscribers alphabetically under the appropriate business classifications and contain classified advertisements of various sizes purchased by RTSC's business subscribers.

3. On August 1, 1974, RTSC entered into a "Telephone Directory Publishing Contract" with Leland Mast Directory Company to publish its annual telephone directory until December 31, 1985. Pursuant to the contract, RTSC granted Leland Mast Directory Company the exclusive rights to compile, print and sell advertising in RTSC's annual telephone directory during that period of time. On July 29, 1985, RTSC entered into an agreement with the Gronseth Directory Service Corporation to publish its annual telephone directory until October 31, 1990.

4. FP is a Kansas corporation that publishes and distributes telephone directories in Kansas and other states. FP publishes and distributes regional telephone directories. These directories are designed to cover certain trade areas and to allow telephone

2

subscribers to have access to telephone numbers in nearby communities. FP first produced a directory for southwest Kansas in 1977. FP produced a directory for northwest Kansas in 1978. The northwest directory covered fifteen counties. The directories produced by FP contained the same white pages and yellow pages similar to the RTSC directory. The advertising contained in the directories, especially the advertising contained in the yellow pages, provides the revenue for FP.

5. The inclusion of white pages listings is necessary for the production of a successful independent telephone directory. Independent directories containing only yellow pages have not been successful. In order to obtain the white pages listings for its directory, FP contacted the telephone companies providing service in the areas of its regional directory. FP sought to obtain the white pages listings by paying the telephone companies for the listings. Some of the companies refused to license their white pages listings initially, but ultimately most have agreed to license the listings. All of the telephone companies in northwest Kansas agreed to provide the listings except RTSC. Each agreement also provides that the telephone company will provide FP with updated listings. The cost for the listings ranged from $. 01 to $ .49 for each listing.

6. Tom Feist of FP contacted Henry Austerman, the manager for RTSC, in 1978 about obtaining the white pages listings. Austerman invited Feist to appear at the next board meeting and make a presentation to the RTSC board of directors. Feist agreed and made

3

a presentation at the April 28, 1978 meeting of the RTSC board of directors.  Feist offered to pay $ .10 for each of RTSC's listings. The issue was left unresolved at that meeting.  The minutes from the meeting reflect the following:

> Representative from area-wide telephone directory was admitted to the meeting at this time, a Mr. Tom Feist from Spearville, Kansas.  His main objective was to purchase from us our directory listings so as to establish a wide area directory for western Kansas. After much discussion on this request the board, upon a motion duly made, seconded, and unanimously approved, voted to table the request indefinitely.

7.   Feist eventually learned that it was unlikely that FP would receive the listings from RTSC.  RTSC refused to provide the white pages listings to FP in order to extend its monopoly in telephone service into yellow pages advertising.  The refusal to deal was not motivated by a legitimate business reason, but by an intent to exclude competition in the yellow pages advertising market in the RTSC service area.  Feist made no further direct efforts to obtain the listings from the RTSC, but he did make several indirect attempts through other individuals.  These efforts were unsuccessful.

8.   RTSC later licensed its white pages listings to other telephone companies for inclusion in their directories.   RTSC provided its listings from Olmitz, Kansas to H & B Communications, Inc. and the Wilson Telephone Company for its 1986-1987 and 1987-1988 telephone directories.  These telephone companies did not sell yellow pages advertising in the RTSC service area.  RTSC was paid $ .50 per listing for the Olmitz listings.

4

9. The directory produced by RTSC in 1977-1978 contained only white pages listings for the communities within its service area. In the following year, RTSC expanded its directory to include listings for towns outside its service area. In order to include white pages listings from communities outside its service area, RTSC licensed these listings from the local telephone companies. RTSC paid from \$ .01 to \$ .49 for these listings. RTSC also sold yellow pages advertising in areas outside of its service area. RTSC, however, did not distribute its directory outside of its service area. RTSC continued these practices in subsequent years.

10. The 1978 northwest Kansas directory produced by FP did include the RTSC white pages listings. FP obtained a copy of the RTSC directory and used the listings without RTSC's knowledge. FP hired verifiers to confirm as many names and telephone numbers as possible. FP did not include any RTSC subscriber in its directory that was not independently verified. This policy meant that many of the RTSC subscribers would not be included in the FP directory because of the problems of verification. FP continued the practice of using the RTSC directory through 1983 for each of its annual northwest Kansas directories. Feist believed that it was necessary to include the communities in the RTSC service area because such an omission would have created "enormous holes" in the FP northwest directory. Feist thought that a lack of complete coverage would have rendered the FP directory ineffective. During the period from 1978 to 1983, FP continued to pay for listings from the other telephone companies in the northwest Kansas area.

5

11. In 1983, RTSC filed the instant action for copyright infringement after finding fictitious listings in FP's directory. RTSC alleged that FP had infringed the copyright on RTSC's 1982-1983 telephone directory. FP responded with the instant counterclaims. FP alleged that its yellow pages advertising had declined because it had incomplete RTSC white pages listings due to RTSC's refusal to enter into a license agreement with FP.

12. On January 5, 1987, the court granted summary judgment to RTSC in its copyright infringement claim. The court subsequently awarded damages to RTSC in the amount of $6,000. The court also awarded attorney's fees to RTSC. These decisions were affirmed by the Tenth Circuit Court of Appeals on March 9, 1990.

13. Each telephone company publishes its directory at a different time of the year. RTSC has generally published its directory in October of each year. FP has generally published its northwest directory in January of each year.

14. The white pages listings in a telephone directory change substantially each year. Feist estimated that the listings change 30 to 35 percent every year.

15. Due to RTSC's failure to license its white pages listings, the FP northwest directory over the years was only 70 percent complete in the RTSC service area. The FP northwest directory, however, also had listings that were not in the RTSC directory. This was apparently due to FP's later publication date and to FP's verification process.

6

16.    FP was unable to identify anyone who had refused to purchase yellow pages advertising in its directory because the FP northwest directory did not contain complete listings from the RTSC service area.    FP was also unable to identify anyone who had complained that the FP northwest directory was incomplete.

17.    The financial success of any telephone directory is dependent upon advertisers and potential advertisers perceiving that the directory is used by the consumers to whom it is distributed.  Customer usage depends on the accuracy, completeness and timeliness of the information contained in the directory. However,    information    in    any    telephone    directory    becomes increasingly inaccurate with the passage of time.    This is the reason that the directories are published on an annual basis.

18.    In 1987, the advertising revenues and respective market shares for the competitors in the RTSC service area were as follows:

| Directory | Advertising revenues($) | Market Share(%) |
|---|---|---|
| Rural Telephone | 56,010.60 | 75.8 |
| Feist Publications | 14,705.50 | 19.9 |
| Phillipsburg | 954.00 | 1.3 |
| Wakeeney | 735.60 | 1.0 |
| Russell | 414.00 | 0.6 |
| Sunflower-Brewster | | |
| Regional | 300.60 | 0.4 |
| Hays | 279.00 | 0.4 |
| Colby | 270.00 | 0.4 |
| Gorham | 138.00 | 0.2 |
| Plainville | 45.00 | 0.1 |
| Total | $73,851.80 | |

7

19.  In 1987, the advertising revenues for FP, RTSC and other

local telephone companies were as follows:

| Service Area | Feist's Revenues | Local Telco's Revenues | Other Dir's. Revenues | Total Adv. Revenues | Feist's Market Share(%) | Feist's Revenues As % of Local Telco's Revenue | Local Telco's Market Share |
|---|---|---|---|---|---|---|---|
| Rural Tel. | 14,705.00 | 56,010.60 | 3,136.20 | 73,851.80 | 19.9 | 26.3 | 75.8 |
| Wakeeney (United Tel) | 52,785.00 | 115,946.10 | 11,877.00 | 180,608.10 | 29.2 | 45.5 | 64.2 |
| Phillipsburg (SWB) | 11,888.00 | 22,506.00 | 10,036.80 | 44,430.80 | 26.8 | 52.8 | 50.7 |
| Norton (SWB) | 35,871.00 | 50,661.00 | 15,953.00 | 102,485.00 | 35.0 | 70.8 | 49.4 |
| Atwood (SWB) | 12,712.00 | 12,414.00 | 166.80 | 25,292.80 | 50.3 | 102.4 | 49.1 |
| Colby (SWB) | 92,602.00 | 114,327.00 | 23,325.60 | 230,254.60 | 40.2 | 81.0 | 49.7 |
| Goodland (SWB) | 41,050.00 | 67,434.00 | 14,932.20 | 123,416.20 | 33.3 | 60.9 | 54.6 |
| Plainville (SWB) | 14,487.00 | 29,889.00 | 7,071.00 | 51,447.00 | 28.2 | 48.5 | 58.1 |
| Hays (SWB) | 149,545.00 | 304,617.00 | 51,294.75 | 505,456.75 | 29.6 | 49.1 | 60.3 |
| Sunflower-Brewster Reg. | 22,222.00 | 101,492.40 | 2,563.80 | 126,278.20 | 17.6 | 21.9 | 80.4 |
| Ness City (Continental) | 14,041.00 | 27,252.60 | 4,757.20 | 46,050.80 | 30.5 | 51.5 | 59.2 |
| Elkhart Tel. | 18,320.00 | 42,724.50 | 846.00 | 61,890.50 | 29.6 | 42.9 | 69.0 |
| Jetmore Tel. | 3,168.00 | 7,666.60 | 1,206.00 | 12,040.60 | 26.3 | 41.3 | 63.7 |
| Ashland (United Assoc.) | 55,461.00 | 85,264.25 | 4,729.40 | 145,454.65 | 38.1 | 65.0 | 58.6 |
| LaCrosse (SWB) | 3,677.00 | 8,004.00 | 3,039.00 | 14,720.00 | 25.0 | 45.9 | 54.4 |
| Russell (United Tel.) | 14,788.00 | 104,005.20 | 27,626.20 | 146,419.40 | 10.1 | 14.2 | 71.0 |
| Ellinwood (United Tel.) | 12,771.00 | 28,380.60 | 9,742.20 | 50,893.80 | 25.1 | 45.0 | 55.8 |
| Hoisington (Cont. Tel.) | 12,111.00 | 41,313.60 | 10,459.20 | 63,883.80 | 19.0 | 29.3 | 64.7 |
| Little River(Mutual Tel) | 3,335.00 | 2,416.50 | 510.00 | 6,261.50 | 53.3 | 138.0 | 38.6 |
| Great Bend (SWB) | 142,226.00 | 346,239.00 | 45,107.25 | 533,572.25 | 26.7 | 41.1 | 64.9 |
| Total for 19 Service Areas Where Local Companies License White Page Listings | 713,060.00 | 1,512,553.35 | 245,243.40 | 2,470,856.75 | 28.9 | 47.1 | 61.2 |
| Gorham Tel. | 349.00 | 1,984.80 | 2,988.60 | 5,322.40 | 6.6 | 17.6 | 373.0 |
| Galva (Home Tel.) | 4,419.00 | 4,092.60 | 834.60 | 9,346.20 | 47.3 | 108.0 | 43.8 |
| Wilson & H&B Tel. Cos. | 7,433.00 | 32,793.60 | 8,121.75 | 48,348.35 | 15.4 | 22.7 | 67.8 |
| Total for 3 Service Areas Where Local Companies Do Not License | 12,201.00 | 38,871.00 | 11,944.95 | 63,016.95 | 19.4 | 31.4 | 61.7 |
| Total for All Areas Except Rural Service Area | 725,261.00 | 1,551,424.35 | 257,188.35 | 2,533,873.70 | 28.6 | 46.7 | 61.2 |

20.  For the period from 1977 to 1987, RTSC has had an annual

rate increase of 11.9 percent.  During the period from 1979 to

1987, FP has had an annual rate increase of 6.2 percent.  The

average rate of increase for all directories in Kansas from 1977

8

to 1987 was 8.3 percent. The average rate of increase for telephone companies that refused to license white pages listings, including RTSC, was 14.2 percent. The average rate of increase for all directories in the United States between 1977 and 1987 was 6.6 percent. The average rate in the United States in 1987 for a quarter column advertisement in directories falling into the distribution size category of the RTSC directory (10,000-24,000) was $283.64 while the RTSC rate was $333.60. The average rate in the United States in 1987 for a quarter column advertisement in directories falling into the distribution size of the FP northwest directory (50,000-99,000) was $386.97 while the FP rate was $324.00.

## CONCLUSIONS OF LAW

### Monopolization and Attempted Monopolization

FP alleges that the RTSC has violated § 2 of the Sherman Act by attempting to monopolize and monopolizing the yellow pages advertising market by refusing to license the white pages listings. Section 2 of the Sherman Act provides that:

[e]very person who shall monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several states . . . guilty of a misdemeanor.

15 U.S.C. § 2.

To prove monopolization, FP must show: (1) that RTSC has possession of monopoly power in the relevant market; and (2) that RTSC willfully engaged in conduct designed to acquire, maintain or enhance its monopoly power. Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 595 (1985). To establish a claim of

9

attempted monopolization, FP must show:  (1) a specific intent by
RTSC  to  monopolize  a  relevant  market;  (2)  predatory  or
anticompetitive conduct by RTSC; and (3) a dangerous probability
of success.   Shoppin' Bag of Pueblo, Inc. v. Dillon Companies,
Inc., 783 F.2d 159, 161 (10th Cir. 1986).  In addition, the fact
of injury and damages suffered by reason of a violation of the
antitrust laws must also be shown for FP to prevail on its claims.
Aspen Highlands Skiing Corp. v. Aspen Skiing Co., 738 F.2d 1509,
1519 n. 12 (10th Cir. 1984), aff'd on other grounds, 472 U.S. 585
(1985).  An attempted monopolization claim requires evidence of a
specific intent to monopolize. Aspen Skiing Co. v. Aspen Highlands
Skiing Corp., 472 U.S. 585, 602 (1984).  The mere intention to
exclude competition and to expand one's own business is not
sufficient to prove a specific intent to monopolize.  See Pacific
Engineering & Production Co. v. Kerr-McGee Corp., 551 F.2d 790, 795
(10th Cir. 1977), cert. denied, 434 U.S. 879 (1977).  Specific
intent may be established by direct proof, or it may be inferred
from predatory conduct, i.e., conduct that is in itself an
independent violation of the antitrust laws or that has no
legitimate business justification other than to destroy or damage
competition.  Great Escape, Inc. v. Union City Body Co., Inc., 791
F.2d 532, 541 (7th Cir. 1986).   Evidence of intent in a
monopolization claim is merely relevant to the question whether the
challenged conduct is fairly characterized as exclusionary or
anticompetitive.  Aspen Skiing Co., 472 U.S. at 602.

10

Relevant Market

Monopoly power is the power to dominate or control a market. United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956). If monopoly power exists, it must be found to exist within an economically meaningful market, or what is called a relevant market. There are two aspects to be considered in defining the relevant market: the relevant product market and the relevant geographic market. Los Angeles Memorial Coliseum Commission v. National Football League, 726 F.2d 1381, 1392 (9th Cir. 1984), cert. denied, 469 U.S. 990 (1984). The determination of relevant market is essentially a question of fact. Aspen Highlands Skiing Corp., 738 F.2d at 1514 n. 4. The burden of establishing the relevant product and geographic market falls upon FP. See Gough v. Rossmoor Corp., 585 F.2d 381, 389 (9th Cir. 1978).

Product Market

The relevant product market consists of those products which are reasonable substitutes from a buyer's point of view. Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). In this case, FP claims that the relevant product market is yellow pages advertising. RTSC does not disagree on this contention. The evidence further supports this stipulation since yellow pages advertising is a unique form of advertising which has no substitute.

Geographic Market

The relevant geographic market is the area in which RTSC faces competition from suppliers of competing products that are in the

11

relevant product market, and to which a buyer can practically turn for the product. See Otter Tail Power Co. v. United States, 410 U.S. 366, 369 n. 1 (1973); Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327-28 (1961). The commercial realities of the industry are the major factors in determining the relevant geographic market. Ralph C. Wilson Industries v. Chronicle Broadcasting Co., 794 F.2d 1359, 1383 (9th Cir. 1986). FP contends that the relevant geographic market in this case is the RTSC service area, and their evidence is designed to show monopoly power in that particular area. This area is identified as the yellow area on Attachment No. 1. RTSC contends that the relevant geographic market in this case extends beyond the expanse of its service area and includes, inter alia, the trade centers of Colby, Hays and Phillipsburg, and that there was no evidence that RTSC exercised monopoly powers in this broadened geographic market. This area consists of the yellow, light blue, red, purple, green, blue, dark brown and brown (only that area between the light blue and yellow) on Attachment No. 1.

The court finds that the evidence establishes that the RTSC service area is the relevant geographic area in this case. This is the area where RTSC and FP effectively compete. It is in this area that the consumer has two choices for purchasing yellow pages advertising that reaches the local community and the regional communities. The area suggested by RTSC is not the area of effective competition. It is true that RTSC and FP do compete in those areas. The RTSC directory, however, is not a legitimate

12

substitute for the FP directory in areas outside the RTSC service area because the RTSC directory is not distributed in those areas. Thus, an advertiser in the areas outside the RTSC service area does not view the RTSC directory and FP directory as substitutes for each other because the RTSC directory is not useful in that advertiser's local community. This advertiser has three choices: the FP directory, the RTSC directory, and his local telephone company directory, which may or may not be a regional directory. For purposes of advertising his business locally and to other areas, the advertiser is restricted to advertising in the FP directory and his local telephone company directory, if it is also a regional directory. The RTSC directory is not a valid substitute for either of these directories because the advertising will not be seen by the local community since the directory is not distributed there.    Accordingly, the only area of effective competition here is the RTSC service area. This is the area where advertisers have choices of two similar products.

## Monopoly Power

Having identified and defined the relevant market, we turn to the question of whether RTSC has monopoly power in that market. Monopoly power is the power to control prices and to exclude competition in the relevant market. Shoppin' Bag, Inc., 783 F.2d at 164.  Monopoly power may be shown through market share, i.e., percentage of the relevant market. Id. at 161. The existence of monopoly power will ordinarily be inferred when a defendant has a predominant share of the market. United States v. Grinnell Corp.,

13

384 U.S. 563, 571 (1966). Market share alone, however, does not establish monopoly power. Bright v. Moss Ambulance Service, Inc., 824 F.2d 819, 824 (10th Cir. 1987). Other factors should also be considered, including the number and strength of the defendant's competitors, the difficulty or ease of entry into the market by new competitors, and consumer sensitivity to change in prices. Shoppin' Bag, Inc., 783 F.2d at 162.

The court finds sufficient evidence of monopoly power here. RTSC had a market share of 75.8% in 1987. A strong inference of monopoly power is raised by this fact alone. Moreover, other factors suggest that RTSC has monopoly power. The evidence before the court shows that RTSC has been able to raise prices over the years without suffering any loss in market share. From 1977 to 1987, RTSC had a higher average annual rate of increase than other telephone companies in Kansas; yet, in 1987, RTSC maintained a higher market share than the average market share of the other telephone companies in Kansas. In addition, RTSC has been able to charge a higher advertising rate than other telephone directories of its size on a national basis. Finally, we note that entry into the relevant market would be difficult for any competitor to RTSC because of time and money factors. In sum, RTSC had monopoly power in the relevant market.

## Willful Maintenance of Monopoly Power:  Refusal to Deal

The existence of monopoly power in the relevant market, however, does not by itself prove the offenses of actual monopolization or attempted monopolization. A monopolist's

14

behavior is not unlawful unless the monopolist has engaged in the "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Grinnell, 384 U.S. at 570-71.  FP contends that RTSC's refusal to license the white pages listings amounts to an illegal refusal to deal in violation of § 2 of the Sherman Act.  There are two distinct lines of cases which have imposed a duty to deal upon a monopolist--the "essential facilities" doctrine, or "bottleneck" theory, and the "intent" test.  Aspen Highlands Skiing Corp., 738 F.2d at 1519.  In Aspen Highlands Skiing Corp., the Tenth Circuit made the following comments about these two theories:

> We recognize that the cases do not fit neatly into these two categories.  There is a significant amount of overlap between them.  Nevertheless the dichotomy, though in part illusory, is a useful analytical tool.  (Footnotes omitted.)

Id. at 1519-20.

## Essential Facilities (or bottleneck)

FP has alleged as part of its monopolization claim that RTSC refused to deal with FP and thereby denied FP access to a facility essential to competition in the marketplace.  FP alleges that RTSC denied it access to the white pages listings without a valid business reason.

Ordinarily, a business has no legal obligation to deal with its competitors.  Aspen Skiing Co., 472 U.S. at 600.  There are situations, however, in which the federal courts have found a duty under § 2 of the Sherman Act for a monopolist to trade with all on

15

nondiscriminatory terms. One of these instances is where the monopolist controls an "essential facility." The "essential facilities" doctrine imposes on the owner of a facility that cannot be reasonably duplicated and which is essential to competition in a given market a duty to make that facility available to its competitors on a nondiscriminatory basis. McKenzie v. Mercy Hospital of Independence, Kansas, 854 F.2d 365 (10th Cir. 1988). The doctrine was established in § 1 cases. See United States v. Terminal Railroad Association, 224 U.S. 383 (1912) (consortium of railroads owning a terminal facility that was only feasible facility when coming to city from east must make facility available to other railroads); Associated Press v. United States, 326 U.S. 1 (1945) (Associated Press enjoined from continuing its practice of refusing to furnish its service to its members' competitors). In Otter Tail, the Supreme Court employed the essential facilities doctrine, although not referring to it by name, to conclude in a § 2 case that a regulated electric utility had used its monopoly power unlawfully to eliminate competition in the retail sale of electric power. In recent times, the federal courts of appeals, including the Tenth Circuit, have adopted standards to determine whether a monopolist's refusal to deal constitutes a violation of the essential facility doctrine under § 2. In Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 738 F.2d 1509 (10th Cir. 1984), aff'd on other grounds, 472 U.S. 585 (1985), the Tenth Circuit, relying on MCI Communications Corp. v. American Telephone and Telegraph Co., 708 F.2d 1081 (7th Cir. 1983), cert. denied, 464 U.S. 891

16

(1983), determined that four elements were necessary to establish liability under the doctrine: (1) control of the essential facility by a monopolist; (2) a competitor's inability to duplicate the facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility. 738 F.2d at 1520.

Three of the elements of the doctrine are not in dispute here. There is no question that RTSC has control over the white pages listings; that RTSC denied FP use of the listings; and that RTSC could easily provide the listings to FP. The only issue in dispute is the essentiality of the white pages listings, i.e., FP's ability to duplicate them.

A monopolist's facility is essential to rivals only where vital to their competitive viability. Areeda & Hovenkamp, 1989 Supplement to Antitrust Law 723 (1989). The defendant's resource is not vital if an equivalent is available from other sources. See McKenzie v. Mercy Hospital of Independence, Kansas, supra (hospital emergency room and obstetrical care unit not essential facility for plaintiff who performed same services in his own private office); Ferguson v. Greater Pocatello Chamber of Commerce, 848 F.2d 976 (9th Cir. 1988) (minidome was not essential facility because plaintiff failed to offer sufficient evidence that monopolist's competitor could not construct another equally adequate facility in the area); Flip Side Productions v. Jam Productions, 843 F.2d 1024 (7th Cir. 1988), cert. denied, ___ U.S.___ (1988) rock concert arena not essential facility where several alternatives available);

17

Florida Fuels, Inc. v. Belcher Oil Co., 717 F.Supp. 1528 (S.D.Fla.
1989) (competitor's fuel storage tanks at port were not essential
facility which could not be duplicated for providing bunkers to
cruise ships where plaintiff fuel oil company made no showing why
other sites were unsuitable); Driscoll v. City of New York, 650
F.Supp. 1522 (S.D.N.Y. 1987) (municipal pier was not essential
facility where there were privately owned alternatives); Robinson
v. Magovern, 521 F.Supp. 842 (W.D.Pa. 1981), aff'd, 688 F.2d 824
(3d Cir. 1982) (hospital was not an essential facility for
physician with staff privileges at other hospitals in area). The
question of equivalence can cover a wide range since everything
that is legal and possible is available at some price. A facility
is not essential unless the plaintiff shows his "inability
practically or reasonably to duplicate" it. MCI Communications,
708 F.2d at 1132. "An inquiry into the practicality of duplicating
the facility should include economic, regulatory and other
concerns." Florida Fuels, 717 F.Supp. at 1533. It is insufficient
for plaintiff to show that access to the facility is merely "more
economical" than other alternatives. Florida Cities v. Florida
Power & Light, 525 F.Supp. 1000, 1007 (S.D.Fla. 1981).

Circumstances similar to those in this case have arisen in
other cases. In Bellsouth Advertising & Publishing Corp. v.
Donnelley Information Publishing, Inc., 719 F.Supp. 1151 (S.D.Fla.
1988), plaintiff, an independent telephone directory publisher,
filed an antitrust action against the telephone company alleging
that the telephone company had maintained monopoly power by not

18

providing it with information such as business classifications and updates.  The court held that the plaintiff could apply the essential facility doctrine to this information to prove intent to monopolize.  719 F.2d at 1566.  The court, however, determined that factual disputes were present as to the essentiality of the information and the availability of the information from alternative sources.  Id.

In <u>Directory Sales Management Corp. v. Ohio Bell Telephone Co.</u>, 833 F.2d 606 (6th Cir. 1987), the Sixth Circuit held, based on uncontroverted evidence, that the service of providing business classifications was not an essential facility because such information was unreliable and thus had to be duplicated in any event by a competitor.  Id. at 613.  The Sixth Circuit further held that the telephone company did not control essential facilities in the form of simultaneous delivery of its white pages and the yellow pages published by a sister subsidiary and the billing of yellow pages listings and advertisements in telephone bills.  Id.  The evidence had shown that the competing producers of yellow pages could provide simultaneous delivery and that the telephone company charged its sister subsidiary a fee far in excess of its costs for the dual billing.  Id.

In <u>White Directory of Rochester, Inc. v. Rochester Telephone Corp.</u>, 714 F.Supp. 65 (W.D.N.Y. 1989), the court held, based on the evidence presented, that the telephone company need not share its white pages listings with a rival independent telephone directory

19

publisher.  Id. at 70.  Judge  Michael A. Telesca determined that the listing information was not an essential facility.  Id.

FP has taken the position that the duplication of the white pages listings would be difficult and economically impractical. RTSC has contended that the information contained in the white pages listings could be reproduced either through a house-to-house survey or through a telephone survey using digit sheets.  RTSC has also pointed out that the courts in the copyright field have recognized that this information could be obtained through independent means.

The evidence concerning the essentiality of the white pages listings was not extensive.  Tom Feist, the owner of FP, testified that it would not be economically feasible to reproduce the white pages listings through other means.  He stated that he had no idea what it would cost to produce the white pages listings by a house-to-house survey.  He further indicated that a telephone survey using digit sheets would be possible, but not practical.  Fred Smykla, the executive director of the National Yellow Pages Service Association, testified that the white pages listings could not be economically generated from scratch.  Dave Grandell, who has been involved in the business of producing independent telephone directories for over ten years, testified that he had attempted to compile white pages listings from scratch using digit sheets from 1978 through 1982 or 1983.  He noted that he had problems finding someone to make the phone calls and getting it completed in a timely manner.  He concluded that it was not economically feasible

20

to obtain the white pages listings without access to the telephone company's listings.  This constituted the sum of the evidence on the subject of the essentiality of the white pages listings.

The cases noted by RTSC from copyright law are helpful in considering this issue.  In considering whether independent telephone directory publishers could use a copyrighted telephone directory produced by the telephone company, courts have indicated that the independent publisher can make fair use of the telephone company's directory if he first makes an honest, independent canvass and then merely compares and checks his own directory with that of the copyrighted publication and publishes the result after verifying the additional items derived from the copyrighted publication.    United Telephone Co. of Missouri v. Johnson Publishing Co., 671 F.Supp. 1514, 1522 (W.D.Mo. 1987), aff'd, 855 F.2d 604 (8th Cir. 1988); Central Telephone Co. of Virginia v. Johnson Publishing Co., 526 F.Supp. 838, 843 (D.Colo. 1981); Northwestern Bell Telephone Co. v. Bedco of Minnesota, Inc., 501 F.Supp. 299, 302 (D.Minn. 1980); Southwestern Bell Telephone Co. v. Nationwide Independent Directory Service, Inc., 371 F.Supp. 900, 906 (W.D.Ark. 1974).  These courts have all recognized that the independent telephone directory publisher can obtain the information contained in the white pages listings through independent research.

The court is not convinced, based on the present record, that the white pages listings are an "essential facility."  The information contained in the white pages listings can be

21

Case 5:83-cv-04086-RDR  Document 120_ Filed 04/05/90  Page 22 of 34

independently obtained from other sources. FP was unable to point
to any regulatory restrictions in obtaining the information. In
addition, FP did not persuade the court that acquiring this
information was either impossible or economically impractical. The
evidence did demonstrate that it would require some effort and some
cost. However, the evidence fell far short of that adduced in
other essential facility cases. See, e.q., Fishman v. Estate of
Wirtz, 807 F.2d 520 (7th Cir. 1984); Hecht v. Pro-Football, Inc.,
570 F.2d 982, 992 (D.C.Cir. 1977), cert. denied, 436 U.S. 956
(1978). The evidence did show that one other independent telephone
directory publisher had made use of digit sheets when the local
telephone company refused access to the white pages listings. We
further note that the copyright laws do not totally preclude the
independent telephone directory publisher from using the local
telephone company directory. The copyright laws require only that
the independent publisher make an honest, good faith effort at
obtaining the information contained in the telephone company
directory prior to using that directory. This requirement, as the
court views it, does not mean that the independent publisher must
contact every telephone subscriber prior to using the telephone
company directory. The independent publisher need only make an
honest effort. The court cannot establish in this opinion what
constitutes such an effort, but we can say that the requirement is
not nearly as constrictive as FP would suggest. Once the
independent publisher has made an honest effort at procuring this
information, then he can use the telephone company directory. With

22

the use of the telephone company directory, the independent publisher has access to the desired facility. Accordingly, we do not find that FP has sustained its burden of proof on this theory of its refusal of deal claim.

## Intent

A second and independent basis for imposing § 2 antitrust liability upon RTSC for its refusal to deal would be a determination that RTSC's actions constituted sufficient evidence of an intent to monopolize. "In addition to the cases finding liability for a refusal to deal when an essential service is involved, there are cases which find liability when a monopolist's refusal to deal with a competitor is shown to be evidence of an illegal intent to destroy competition. These cases focus on the intent and competitive effect of the refusal to deal; not on whether the facility itself is 'essential.'" MCI Communications Corp., 708 F.2d at 1148 (citations omitted). The theoretical distinction between the intent theory and the essential facilities doctrine is that the former focuses on the monopolist's state of mind while the latter examines the detrimental effect on competitors. Byars v. Bluff City News Co., 609 F.2d 843, 856 (6th Cir. 1979). However, as recognized by the Tenth Circuit in Aspen Highlands Skiing Corp., there are many overlapping considerations in practice.

Once again, ordinarily, a company may deal or refuse to deal with whomever it pleases, as long as it acts independently. Aspen Skiing Co., 472 U.S. at 600. Even a company with monopoly power

23

in a relevant market has no general duty to cooperate with its business rivals and may refuse to deal with them if valid business reasons exist for such refusal. Id. at 604. It is unlawful, however, for a monopolist to engage in conduct, including refusals to deal, that unnecessarily excludes or handicaps competitors in order to maintain its monopoly into another relevant market. Exclusionary conduct is conduct that does not benefit consumers by making better products or services available, by increasing efficiency, or in other ways, but instead has the effect of impairing competition. Id. at 605.

Having carefully reviewed the sum of the evidence, we find an intent by RTSC to exclude FP in order to extend its monopoly into another relevant market. In reaching this conclusion, the court has carefully weighed the evidence presented to the court. We believe that the intent of RTSC was honestly reflected during discovery in this case. FP propounded an interrogatory to RTSC asking for the reason for RTSC's refusal to license the white pages listings to FP. RTSC responded as follows: "Compilation of white page listings is an ongoing year 'round effort of [RTSC] to be provided to its subscribers. Costs are recovered from the subscribers and revenues derived from Yellow Page ads. Any profits realized from the directory are used to keep rates down. Furnishing these listings to anyone would be defeating one of the purposes of the co-op." In addition, the following occurred during a deposition of Merlin Dennis, a member of the board of directors of RTSC, after the interrogatory had been answered:

Q: You don't recall why you refused to license listings to [FP]?

A: No, not absolutely. I know it was the motion of the board to do that and I don't recall any particular discussion, no.

Q: Do you still refuse to license listings to [FP]?

A: Speaking for the board, that's their feeling. You are asking me as a spokesman for the board. Is that correct?

Q: Either that or as president of the corporation.

A: At this point we have not changed our decision.

*   *   *   *   *

Q: You have answered the interrogatory, the corporation has, stating the reason you refused to license listings to [FP] is because it would defeat your purpose. You state that your costs of compilation are recovered from subscribers and revenues derived from Yellow Page ads. What I am asking is what's the recovery of cost from the Yellow Page ads have to do with your purpose?

A: Any income that comes to the organization will affect the rates that the subscribers pay.

Q: What does that have to do with licensing the listings to [FP]?

A: Anything that will affect the operation of our Yellow Pages.

*   *   *   *   *

Q: Okay, that's the total extent of your answer, is that it is a business decision. No matter how much I ask you, you are never going to say anything about reasons, is that right?

A: Never is a long time.

Q: Would you like to have [FP] out of the area?

A: I am not going to answer that.

Q: Why don't you answer that?

A: I think the reason, the answer is obvious why I do not answer.

25

The aforementioned responses suggest quite clearly that RTSC did not want any competition in the yellow pages advertising market. Although the testimony at trial differed from the record established during discovery, we were not persuaded by it. Merlin Dennis testified at trial, and his memory was much clearer. He testified that he had refreshed his recollection and he now clearly remembered that RTSC had refused to license the white pages listings to FP because the RTSC board believed that its subscribers were suspicious of a new independent telephone directory and was concerned that the licensing of the white pages listing might violate the contract that RTSC had with its directory publisher. The court did not find Mr. Dennis' trial testimony credible in light of the evidence adduced during discovery. The discovery materials strongly suggest that RTSC's intent was to destroy competition. The conduct of RTSC impaired the opportunities of FP and did not further competition on the merits. RTSC's refusal to deal was exclusionary conduct, not competitive conduct. The suggestion that the RTSC board was unwilling to license the white pages listings because subscribers were leery of an independent telephone directory was unsupported. In addition, the contention that the licensing of the white page listings to FP might have violated the contract with RTSC's directory publisher also lacks credence. A quick review of the contract would have settled this concern. The overriding interest of the RTSC board was the damage that the FP directory would do to RTSC. Accordingly, although RTSC generally may be free to deal with whomever it pleases, we find

based on a review of the evidence that its real purpose was to extend its monopoly in telephone service to a monopoly in yellow pages advertising unlawfully, and conclude that its behavior constitutes an illegal refusal to deal under § 2 of the Sherman Act.

This finding is further supported by the evidence indicating that RTSC was willing to license its white pages listings to non-competitors.  RTSC had no problem in licensing its listings to telephone companies that did not sell advertising in the RTSC service area.  This sort of discriminatory refusal to deal is unlawful.  See Lorain Journal Co. v. United States, 342 U.S. 143 (1951).

Accordingly, although RTSC generally may be free to deal with whomever it pleases, we find based on a review of the evidence that its real purpose was to extend its monopoly in telephone service to a monopoly in yellow pages advertising unlawfully, and conclude that its behavior constitutes an illegal refusal to deal under § 2 of the Sherman Act.

## Injury

The court shall next turn to the issue of injury and damages. RTSC argues that, even assuming it abused its monopoly power, FP cannot recover because it has failed to establish that RTSC's unlawful conduct caused FP injury and damages to its business.

Injury is an essential element that a plaintiff must prove to recover under the antitrust laws.  Aspen Highlands Skiing Corp., 738 F.2d at 1523.  FP must prove antitrust injury "reflect[ing]

27

the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." Brunswick Corp. v. Pueblo Bowl-O-Matic, Inc., 429 U.S. 477, 489 (1977). Proving causation does not require plaintiff to prove the value of its injury. It requires only that plaintiff prove that it was in fact injured by defendant's alleged antitrust violation. If plaintiff was in fact injured, then we must consider the amount of plaintiff's damages. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n. 9 (1969); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555 (1931).

The court is satisfied that FP offered evidence which established as a matter of fact and with a fair degree of certainty that RTSC's illegal conduct was a material cause of FP's injury. FP demonstrated that RTSC's refusal to license the white pages listings had an impact on its market share and its advertising rate. The evidence revealed that FP's directory was incomplete and inaccurate because of RTSC's refusal to license its white pages listings. The evidence further revealed that FP's market share in areas where the local telephone company licensed its white pages listings was significantly higher than its market share in the RTSC service area. In sum, the requirement of proof of injury as an element of plaintiff's case was met.

Damages

The standards involved in proving damages in antitrust cases were set forth in Aspen Highlands Skiing Corp. as follows:

   The Supreme Court has recognized that an antitrust
   plaintiff is rarely able to prove its damages with

28

Case 5:83-cv-04086-RDR Document 120 Filed 04/05/90 Page 29 of 34

mathematical precision. <u>See</u> <u>e.g.</u>, <u>J. Truett Payne Co.</u> <u>v. Chrysler Motors Corp.</u>, 451 U.S. 557, 566, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981) ("The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of defendant's antitrust violation."); <u>Zenith Corp. v.</u> <u>Hazeltine</u>, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969) ("damages issue in [cases where plaintiff was partially or totally excluded from a market] are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts"); <u>see</u> also <u>King & King Enterprises v. Champlin</u> <u>Petroleum Co.</u>, 657 F.2d 1147, 1158 (10th Cir. 1981), <u>cert. denied</u>, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982); <u>Cackling Acres, Inc. v. Olson Farms, Inc.</u>, 541 F.2d 242, 246 (10th Cir. 1976), <u>cert. denied</u>, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). The Court has emphasized that the trier of fact can determine the amount of damages from "a just and reasonable estimate of the damage based on relevant data." <u>Bigelow</u> <u>v. RKO Radio Pictures</u>, 327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). The damage award, however, may not be based on "speculation or conjecture." <u>Id</u>.

738 F.2d at 1525-26.

FP presented the testimony of Charles P. Goldfarb, an economist with an extensive background in antitrust matters. Mr. Goldfarb determined that the range of damages suffered by FP over the ten-year period between 1978 to 1988 was $33,000 to $58,000. Mr. Goldfarb arrived at this figure using several assumptions and several calculations. Mr. Goldfarb's calculations were performed only for the year 1987. He first assumed that FP would have gained as much of the market in the RTSC service area as it had in other areas where it had been able to license the white pages listings. This meant that FP's market share would have increased 9%. This 9% increase would have boosted earnings by $6,600. Mr. Goldfarb called this calculation a "conservative estimate." This was deemed a conservative estimate because Mr. Goldfarb assumed that the total

29

sales in the RTSC service area would not have increased even if FP had been able to license the white pages listings. Mr. Goldfarb noted that advertisers in the RTSC service area might have purchased more advertising if they believed that the FP was producing a better product. He noted further that it assumes that FP was not harmed outside the RTSC service area as a result of the incomplete listings in the RTSC service area. He believed that the incomplete listings in the RTSC service area might have had an impact on FP's ability to sell outside the RTSC service area. He also performed a less conservative estimate which showed a gain of revenues of $11,600. This calculation reflected an increase in FP's percentage of RTSC's revenues to the percentage that FP had achieved in comparison to other local telephone companies. Mr. Goldfarb then divided these figures in half and multiplied them by five. He divided them in half and only multiplied them by five rather than ten in order to be "very conservative" in his damages estimate. He did not figure the cost of licensing the white pages listings because he noted that the cost of verification is the same or higher than the cost of the listings.

The court has carefully considered all of the testimony offered at trial as it related to the issue of damages. Having carefully reviewed that testimony, the court concludes that FP suffered damages in the amount of $33,000. We believe that this amount is a conservative one, but an appropriate one. The court found no merit to RTSC's efforts to attack Mr. Goldfarb's testimony as insufficient, incomplete or inaccurate. In reaching this

30

conclusion, we note that once a plaintiff has proved the fact of injury, it is allowed considerable latitude in proving the amount of damages resulting from that injury. No mechanical test or formula requires that damage proof conform to a particular theory or model. An antitrust plaintiff has a lesser burden of proof as to damages than do plaintiffs in other types of civil actions. See Zenith Radio Corp., 395 U.S. at 123. RTSC sought to point out that Mr. Goldfarb used only the figures from 1987 in arriving at his damages figure. RTSC contended that FP should have produced figures for each of the ten years for which it sought damages. The court was convinced that the year 1987 was a representative year and could be used to estimate the total amount of FP's damages. Mr. Goldfarb's subsequent calculations suggested that a very conservative methodology. Thus, we are unable to conclude that his final figures were based on speculation or conjecture. We note that RTSC could have made the necessary calculations if it believed that the numbers used by Mr. Goldfarb were inaccurate or not representative. RTSC also pointed out that it was a co-op company and that the market shares it obtained may have been due to loyalty by its telephone subscribers and/or the economic interests of its telephone subscribers. Mr. Goldfarb discounted this contention, and we agree with his analysis. In sum, we are convinced that the figure of $33,000 is the proper amount of FP's damages. This amount shall be trebled for a total award of $99,000.

31

## Injunctive Relief

The court shall also grant the injunctive relief sought by FP. Injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26, is granted for the purpose of preventing threatened loss or damage by reason of a violation of the federal antitrust laws. Helfenbein v. International Industries, Inc., 438 F.2d 1068, 1071 (8th Cir. 1971), cert. denied, 404 U.S. 872 (1971). In the framing of equitable decrees, the district courts are clothed with broad discretion to model their judgments to fit the exigencies of the particular case. See Allis-Chalmers Manufacturing Co. v. White Consolidated Industries, Inc., 414 F.2d 506, 525 n. 32 (3d Cir. 1969), cert. denied, 396 U.S. 1009 (1970). The court shall enjoin RTSC from refusing to license its white pages listings at a reasonable rate. The court shall provide the parties the opportunity to reach an agreement on this rate. This agreement should be reached within thirty days of the date of this order. This matter shall be resubmitted to the court if the parties fail to reach an agreement.

## Attorney's Fees

Finally, the court shall also award attorney's fees to FP. 15 U.S.C. §§ 15 and 26. The parties should make some effort to resolve this aspect of the case pursuant to the guidelines established in Local Rule 220. The issue of the amount of attorney's fees should be submitted to the court if no agreement is reached by the parties.

32

**IT IS THEREFORE ORDERED** that judgment hereby be entered in favor of Feist Publishing, Inc. in the amount of $99,000.00.

**IT IS FURTHER ORDERED** that Rural Telephone Service Company, Inc. be hereby enjoined from refusing to license the white pages listings to Feist Publishing, Inc. at a reasonable rate. The parties shall attempt to resolve the amount of this rate within thirty days of the date of this order. If no agreement is reached, the court shall determine the appropriate rate.

**IT IS FURTHER ORDERED** that Feist Publishing, Inc. be hereby awarded its attorney's fees in litigating this action. The parties should make some effort to resolve this issue in accordance with Local Rule 220. The issue should be submitted to the court if no agreement is reached by the parties.

**IT IS SO ORDERED.**

Dated this $5\frac{th}{}$ day of April, 1990 at Topeka, Kansas.

United States District Judge

33



Northwest Kansas Area Telephone Company Coverage